## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL DRAKE, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| CITY OF CHICAGO, CHICAGO POLICE | ) | |
| OFFICER SHERINA GANJANAGET #5012, | ) | |
| AND UNKNOWN CHICAGO POLICE | ) | |
| OFFICERS; | ) | |
| | ) | |
| *Defendants.* | ) | JURY TRIAL DEMANDED |
| | ) | |
| | ) | |
| | ) | |

## COMPLAINT

Plaintiff, Michael Drake, by and through his attorneys, Loevy & Loevy, now complains of Defendants City of Chicago, Chicago Police Officer Ganjanaget #5012, and Unknown Chicago Police Officers, stating as follows:

## INTRODUCTION

1. On May 25, 2020, a Black man named George Floyd was senselessly and brutally killed by police officers in Minneapolis, Minnesota. Mr. Floyd's death was captured on video and circulated widely. The murder of George Floyd became a flashpoint for people around the globe to protest against police misconduct.

2. On May 30, 2020 hundreds of people demonstrated against police violence in downtown Chicago, a city with longstanding fractures between the communities and police.

3.      In response to the protests against police violence, the Chicago Police Department continued its notorious history of abuse by committing egregious violent acts against protesters, legal observers, and journalists exercising their constitutional rights, including Plaintiff.

4.      Plaintiff, a recent law school graduate, attended the protest as a National Lawyers Guild (NLG) "legal observer." The NLG is an organization of lawyers, law students, legal workers, and jailhouse lawyers who operate as a political and social force, working to build a world where human rights are regarded as more sacred than property interests. The Chicago chapter of the NLG provides "Legal Observers" who document police behavior during protests.

5.      Police used unprovoked and unjustified violence against Plaintiff during the May 30, 2020 protest.

6.      There was no justification for this beating.

7.      Police then falsely arrested Plaintiff. There was no probable cause to arrest Plaintiff.

8.      The brutal response to Plaintiff and others seeking justice for victims of police violence is not an anomaly or the result of "a few bad apples." The Chicago Police Department has a long history of excessive force and false arrest against civilians and has used excessive force and false arrest to chill expression protected by the First Amendment and quell movements for social justice. This lawsuit seeks redress for those unconstitutional acts.

## PARTIES

9.     Plaintiff Michael Drake is a recent graduate of the John Marshall Law School and a combat veteran of the United States Army. He currently works as a legal aid attorney representing low-income families facing eviction from their homes.

10.     Defendant Ganjanaget and Unknown Chicago Police Officers are police officers employed by the City of Chicago (hereinafter "Defendant Officers").

11.     Defendant City of Chicago is a municipal corporation duly incorporated under the laws of the State of Illinois, and is the employer and principal of Defendant Officers.

## JURISDICTION

12.     This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331.

13.     Venue is proper under 28 U.S.C. § 1391(b).  Plaintiff's permanent address is in this judicial district and Defendant City of Chicago is a municipal corporation located in this judicial district. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

## FACTS

14.     On May 30, 2020, Plaintiff attended the protests in downtown Chicago as an NLG legal observer. Plaintiff was wearing a bright green baseball cap reading "National Lawyers Guild." Legal observers wear these hats at all protests they attend and they are a familiar symbol to protesters and police officers.

15.     Plaintiff observed various instances throughout the day when police officers beat protesters with batons and committed other acts of indiscriminate violence.

16.     Plaintiff eventually observed a crowd of protesters near Trump Tower. Protesters were on a bridge and the police officers were pushing the crowd.

17.     While police officers were pushing the crowd forward, they began beating members of the crowd with their batons.

18.     Plaintiff tried to find out the names of the individuals who were being beaten as part of his role as a Legal Observer.

19.     As Plaintiff called out to ask for the names of the people being beaten, police officers began to beat Plaintiff with their batons.

20.     Eventually, the officers dragged Plaintiff's body some feet away and continued beating him. The officers also beat two people who tried to help Plaintiff.

21.     The Defendant Officers then arrested Plaintiff even though Plaintiff had not committed any crimes.

22.     Plaintiff was taken into police custody and held overnight.

23.     After his release from custody, Plaintiff sought medical treatment.

**Chicago Police Department's Policy & Practice of Excessive Force**

24.     More than twenty years ago, in 1999, following two high profile police shootings, the City Council held public hearings on the prevalence of police brutality and unjustified shootings, as well as the failure of the Department's disciplinary system. At those hearings, members of the Council assured the public that changes would be made to the Chicago Police Department policies and practices to address these issues.

25.     On September 28, 1999, the then-Superintendent of Police gave a speech highlighting problems with the City's policies and practices relating to the use of force. Then-Superintendent Hillard spoke specifically of the need for (1) better in-service training on the use of force, (2) an effective disciplinary system, and (3) officer accountability for the use of force.

26.     In a review commissioned by the Superintendent, John Marshall Law School found that although the City of Chicago's written policy on the use of force was in compliance with the law, more training of police officers was necessary for the written policy to be effective in practice.

27.     In January 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

28.     A study performed a year later by the Justice Coalition of Greater Chicago concluded that the CPD lacked many of the basic tools necessary to identify, monitor, punish, and prevent police misconduct and brutality.

29.     Although the City has long been aware that its supervision, training, and discipline of police officers are entirely inadequate, it has not enacted any meaningful measure to address that failure.

30.     In 2017, the Department of Justice concluded the following:

        a.      Deficiencies in CPD's training, supervision, accountability, and other systems had contributed to a pattern and practice of excessive use of force;

        b.      The CPD failed to review its force practices as a whole to identify problematic trends and patterns that endangered the officers and the community; and

        c.      The CPD failed to provide its officers with adequate guidance to understand how and when they may use force or how to safely and effectively control and resolve encounters to reduce the need to use force.

31.     As a result of Chicago's inadequate training and supervision, officers on the streets are ill-equipped to make the necessary decisions on the use of force. The lack of training and supervision greatly increases the susceptibility of officers to improper and violent abuses of their police power through the unjustified use of force, such as the excessive force used on Plaintiff.

32.     On August 29, 2017, the Illinois Attorney General sued the City for, "engaging in a repeated pattern of using excessive force, including deadly force, and other misconduct that disproportionately harms Chicago's African American . . . residents."

33.     On July 27, 2018, the City and State of Illinois reached an agreement on structural reforms needed to address CPD's practice of using excessive force against African Americans.

34.     As part of the Consent Decree, the City agreed to implement de-escalation techniques to prevent or reduce the need for force; track and analyze incidents where CPD officers use force and/or a firearm; develop a training bulletin providing guidance on use of weapons; and implement policies for supervision, investigation, and accountability relating to use of force by officers, among other things.

35.     A recent independent monitoring report has found that the City has missed deadlines or is otherwise not in compliance with various agreed improvements related to use of force by CPD officers.

**Violence by the CPD Against Protesters Exercising Their First Amendment Rights**

36.     Plaintiff's experience at the protest was not an anomaly. The Chicago Police Department has historically responded—and continues to respond—to protests with unconstitutional tactics.

37.     On June 23, 2020, the *Chicago Reader* published an in-depth examination of the CPD's use of lethal force during the May 2020 protests. The reporter documented "83 baton strikes on at least 32 different people by officers, most captured on video.  Nearly all appear to violate [CPD] policy with more than half of the strikes on video involving police beating people who were already on the ground. Multiple videos also show officers hitting protesters in the head with batons despite rules limiting these strikes to situations requiring deadly force." The *Reader* article notes that these unlawful uses of force often occurred in full view of supervisors who failed to intervene and that most officers failed to report their uses of force.

38.     CPD's response to the protests against police violence has also included police officers tackling protesters to the ground, kneeing protesters in the neck and back, kicking protesters in the legs to cause them to fall, trapping protesters on bridges, pushing protesters stranded on bridges, pinning protesters against hard surfaces, using tear gas and pepper spray, dragging protesters through the streets, punching protesters in the face, stomping on protesters on the ground, and beating protesters severely.

39.     CPD officers have pushed, shoved, battered, and harassed people who were filming acts of police brutality during the protests. Often this resulted in confiscated or damaged cameras and physical injury to protesters exercising their First Amendment right to record the police.

### Policy and Practice of Impunity

40.     At all times relevant to Plaintiff's claims, the City of Chicago and CPD routinely failed to investigate cases in which Chicago Police Officers used excessive force and/or seized an individual without justification.  Prior to and during the period in which Plaintiff

suffered excessive force and false arrest, the City of Chicago also operated a dysfunctional disciplinary system for Chicago Police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

41.     In the DOJ's 2017 report on CPD (mentioned in the previous section), regarding the subject of supervision, the DOJ concluded among other things that "[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers.  CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law.  The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory practices.  Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result."

42.     The DOJ "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy."  In particular, the DOJ found that the City failed to investigate nearly half of misconduct complaints; where investigations did occur, there were "consistent patterns of egregious investigative deficiencies;" and where misconduct complaints are sustained, discipline was inconsistent and unpredictable.

8

43.     Similarly, the Chicago Police Accountability Task Force ("PATF") reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority."

44.     Between 2004 and 2016, the City paid more than $500 million to settle or pay judgments in police misconduct cases, without even conducting disciplinary investigations in more than half of the cases, and while recommending discipline in fewer than 4% of those cases.

45.     Between 2011 and 2015, nearly half of complaints filed against Chicago Police officers were not even investigated.

46.     More than 95% of complaints against the Chicago Police are found to be un-sustained as of 2016.

47.     Less than 2% of complaints against the Chicago Police resulted in any discipline as of 2016.

48.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. in accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

49.     The failure of police supervision and discipline in the City of Chicago throughout history is a fact admitted by City policymakers and Chicago Police officers.

50.     Former Mayor of the City of Chicago Rahm Emanuel has acknowledged that a "code of silence" exists within the Chicago Police Department.

51.     In December 2016, the President of the police officers' union in Chicago admitted that there is a "code of silence" in the Chicago Police Department.

52.     In 2017, the DOJ found that current officers of the CPD and former high-level officials of the CPD acknowledged a "code of silence."

53.     Mayor Lori Lightfoot urged federal prosecutors to examine the trial of Chicago Police officers accused of covering up the Laquan McDonald shooting, saying "[w]e've got to have transparency and healing."

54.     Most recently, in January 2020, the interim Superintendent of CPD, Charlie Beck also acknowledged that "code of silence" exists in CPD.

55.     The code of silence in the Chicago Police Department has been longstanding.

56.     In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill.), a federal jury found that as of 1994 the Chicago Police maintained a code of silence that facilitated police misconduct.

57.     In *Obrycka v. City of Chicago*, No. 07 C 2372 (N.D. Ill.), a different federal jury found that, as of February 2007, "the City had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

58.     The same code of silence and ineffective system of police oversight were in place when Plaintiff's constitutional rights were violated on May 30, 2020.

59.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendant Officers here) have come to believe that they may violate the civil rights of members of the public.

60.     As a result of these policies and practices of the City of Chicago, members of the

Chicago Police Department act with impunity when they violate the constitutional and civil

rights of citizens. This includes the Defendant Officers in this case.

**Plaintiff's Damages**

61.     As a result of Defendants' misconduct, Plaintiff suffered severe physical pain and

injury as well as emotional distress.

**COUNT I**
**42 U.S.C. § 1983 – Excessive Force**
**Fourth Amendment**

62.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

63.     In the manner described more fully above, Defendants violated Plaintiff's Fourth

Amendment right to be free from unreasonable force, including but not limited to beating

Plaintiff, throwing him to the ground, dragging him, and kicking him.

64.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered

serious physical injury, great mental anguish, humiliation, degradation, physical and

emotional pain and suffering, and other grievous and continuing injuries and damages as set

forth above.

65.     The misconduct described in this Count was undertaken pursuant to the policies

and practices of the City of Chicago and the Chicago Police Department, in the manner more

fully described below in Count VI.

**COUNT II**
**42 U.S.C. § 1983 – False Arrest**
**Fourth Amendment**

66.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

67.     In the manner described more fully above, Defendants falsely arrested Plaintiff

without justification and without probable cause.

11

68.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT III**
**First Amendment Retaliation**

69.     Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

70.     In the manner described more fully above Defendants, individually, jointly, and in conspiracy with one another, and others, violated Plaintiff's First Amendment right by subjecting Plaintiff to retaliation for exercising his constitutional right to free expression and association.

71.     Defendants' retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights.

72.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to Plaintiff's constitutional rights.

73.     As a result of Defendants' misconduct, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

74.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT IV
## U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

75.     Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

76.     Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to deprive Plaintiff of his constitutional rights, all as described in the various paragraphs of this Complaint.

77.     In so doing, these co-conspirators conspired to accomplish an unlawful purpose by unlawful means.

78.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

79.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to Plaintiff's constitutional rights.

80.     As a result of Defendants' misconduct, Plaintiff suffered loss of liberty, physical pain and suffering, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

81.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT V – 42 U.S.C. § 1983
## Failure to Intervene

82.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

83.     In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

84.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

85.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered serious physical injury, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, loss of liberty, and other grievous and continuing injuries and damages as set forth above.

86.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT VI**
**42 U.S.C. § 1983**
**Policy and Practice Claim against the City of Chicago**

87.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

88.     As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

89.     At all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice by officers and

agents of the Chicago Police Department and the City of Chicago of using excessive force against individuals, as well covering up or providing false justification for the use of force.

90.     In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice by officers and agents of the Chicago Police Department and the City of Chicago of instigating false criminal charges in an effort to create narratives that justify the use of force by CPD officers, often in situations where the use of force was unjustified.

91.     In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice by officers and agents of the Chicago Police Department and the City of Chicago of falsely arresting protesters, journalists, and legal observers in a manner which chilled First Amendment free expression.

92.     These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

93.     The above widespread practices and customs, so well settled as to constitute *de facto* policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

15

94.     At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: use of force; reporting incidents where excessive force was used; police activity at demonstrations; and making arrests at demonstrations. In addition or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

95.     These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago.

96.     In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

97.     As a result of the policies and practices of the City of Chicago, numerous individuals have suffered injury or death resulting from unreasonable use of force.

98.     As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly prosecuted and imprisoned for crimes that they did not commit.

99.     Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named

16

Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VII
### Illinois Law – Battery

100.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

101.    In the manner described above, Defendants, acting under color of law and within the scope of their employment, engaged in offensive physical contact made without the consent of Plaintiff.

102.    These actions were undertaken intentionally, willfully and wantonly, or recklessly.

103.    The misconduct described in this Count was objectively unreasonable and was undertaken with intentional disregard of Plaintiff's rights.

104.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII
### Illinois Law – False Arrest

105.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

106.    In the manner described above Defendants, acting under color of law and within the scope of their employment, arrested Plaintiff in the absence of probable cause.

107.    These actions were undertaken intentionally, willfully and wantonly, or recklessly.

108.    The misconduct described in this Count was objectively unreasonable and was undertaken with intentional disregard of Plaintiff's rights.

17

109.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT IX
### Illinois Law – Intentional Infliction of Emotional Distress

110.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

111.     The actions, omissions, and conduct of the Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

112.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT X
### Illinois Law – Civil Conspiracy

113.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

114.     As described more fully in the preceding paragraphs, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to batter Plaintiff and falsely arrest Plaintiff. Defendants conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

115.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

116.    The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

117.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

118.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count XI
### Illinois Law- Respondeat Superior

119.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

120.    While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

121.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## Count XII
### Illinois Law- Indemnification

122.    Illinois statute (745 ILCS 10/9-102) provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

19

123.    The Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff Michael Drake respectfully requests that this Court enter judgment in his favor against Defendants, awarding compensatory damages, punitive damages, attorney's fees and costs pursuant to 42 U.S.C. § 1988, and any other relief the Court deems just and appropriate.

**JURY DEMAND**

Plaintiff Michael Drake demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

Respectfully submitted,

BY: /s/ Theresa Kleinhaus
*One of Plaintiff's Attorneys*

Jon Loevy
Theresa Kleinhaus
Danielle Hamilton
Loevy & Loevy
311 N. Aberdeen Street
3rd Floor
Chicago, IL 60607
T: (312) 243-5900
F: (312) 243-5902
Tess@loevy.com